2006 VT 4

**STATE of Vermont v. Barbara McCARTY**

[892 A.2d 250]

No. 04-486

¶ 1. January 10, 2006. Defendant appeals an order of the Caledonia District Court directing her hospitalization for ninety days at the Vermont State Hospital to obtain psychiatric treatment. Defendant argues the district court erred for two reasons: (1) the evidence was insufficient to support an order of involuntary hospitalization; and (2) statements she made during a court-ordered psychiatric evaluation were used to support the court's decision in violation of her constitutional privilege against self-incrimination. We reject both arguments and affirm.

¶ 2. In April 2004, the State charged defendant with truancy for failing to send her child to school. After defendant failed to appear at her arraignment, the court issued a warrant for her arrest. She was arrested on May 3, 2004. Because of her actions during the arrest, the State added a charge of resisting arrest. Following a May 17 hearing, the court ordered a psychiatric evaluation, over defendant's objection, on her competency to

stand trial. Defendant moved for reconsideration, and, on June 15 and 16, the court held a hearing on the motion and denied defendant's request. The court issued a second examination order, this time as to both competency and sanity. Defendant failed to appear for the evaluation, resulting in another arrest warrant. On September 2, she was arrested and arraigned on a charge of violating her conditions of release. On September 8, the court issued a third examination order — like the second one, as to both competency and sanity — and set a hearing for October 18, 2004. Each of the three orders bears the following warning: "A Notice of Hearing on the results of the examination will be sent to all parties. If the defendant is found incompetent, a hospitalization hearing will be held immediately following the competency exam." Dr. Paul Cotton examined defendant on September 16 and issued a written report, concluding that she was not competent to stand trial and that, at the time of the offense, she was insane.

¶ 3. At the October 18 hearing, the State called Dr. Cotton and two Vermont State Police officers. The court also received Dr. Cotton's report into evidence. The section of his report entitled "Non-Confidentiality Warning" states that before starting the evaluation Dr. Cotton told defendant that he was a psychiatrist retained by the court to gather information regarding the circumstances of the charges against her. The report continues:

> I informed her that what she said could be used to determine her competency to stand trial and her criminal responsibility for the offense charged. Anything she said could be included in my written report or in oral testimony. She was informed that her participation was voluntary. She understood and wished to proceed.

In his testimony, Dr. Cotton reiterated that when he met with defendant he informed her that the examination was not confidential and she was free to decline to answer any questions. He testified that she indicated she was willing to go ahead with the examination.

¶ 4. In concluding that defendant was not competent to stand trial, Dr. Cotton wrote in his report that while defendant could become competent if she took antipsychotic medication, "[g]iven her deficient insight and judgment, it is unlikely that she would do so without a Court order for involuntary treatment." In the section entitled "Observations Regarding Criminal Responsibility," he wrote that defendant's "mental illness is severe. Her paranoid delusional beliefs interfere with her capacity to ... accept and respect the regulation of both the schools and the Court."

¶ 5. At the hearing, Dr. Cotton further explained his conclusions that defendant was neither competent to stand trial nor sane at the time of the charged offenses. He testified that defendant was delusional and paranoid, and that her mental illness made her dangerous, causing her to act in an assaultive manner at times. He stated that her delusional belief system was pervasive and growing stronger, making her quick to view any person as either incompetent or aligned against her and thus to treat that person as an adversary.

¶ 6. When asked whether treatment could make defendant competent to stand trial, Dr. Cotton responded that in his opinion "the only safe place to treat her would be at the Vermont State Hospital because she's got fixed delusional beliefs." He explained that the Hospital provides a "safe, secure and clinically excellent treatment environment" where "staff can petition for involuntary medication since it's highly unlikely she would accept medication." He also testified that treatment resources in the community

short of hospitalization would not be appropriate, because her "treatment would only be successful if she had a secure, well-organized system of care that's used to dealing with people that have her degree of mental illness." Dr. Cotton opined that without adequate treatment defendant's condition would worsen over time and she would have difficulty managing in the community at large.

¶ 7. The two police officers who testified described the circumstances of defendant's arrests. First, Trooper Gordon Lambert, who arrested defendant in May 2004, testified that she told him he would have to "break every bone in her body" to arrest her. When Trooper Lambert made the arrest, defendant began to "violently kick and flail her arms," and tried to scratch the officers. The State then called Trooper Eugene Duplissis, who arrested defendant on September 2, 2004. He testified that defendant vigorously resisted the arrest and that, at one point during the struggle, he sprayed her with capsicum pepper spray, with no apparent effect.

¶ 8. After completing the evidentiary portion of the hearing, the court had a discussion with counsel about the topics to be covered in counsel's legal arguments. After the court noted that "typically we have a treatment hearing at another date if there is a finding of incompetency or sanity," the prosecutor replied that he had called the court to verify that the hearing would also include a hospitalization hearing and was advised that it would. The court responded: "If that's the parties' understanding, we'll proceed on that basis. We'll hear arguments as to both issues." Defense counsel did not object.

¶ 9. After counsel's arguments, the court made its findings on the record, acknowledging that its findings had to be supported by clear and convincing evidence. The court found that defendant

suffered from a mental illness and, as a result, lacked a rational understanding of the proceedings and would not be able to communicate with and assist her attorney. Thus, the court concluded she was not competent to stand trial. The court also found that defendant's illness impaired her judgment and self-control to an extent that it put others in danger of harm, as demonstrated by her two arrests. The court thus determined defendant was a person in need of treatment.

¶ 10. The court went on to find that the "credible testimony of Dr. Cotton establishes that [defendant] is resistant to treatment" and that "in the absence of close supervision, continuity of care, monitoring of treatment which may or may not include administration of medications, . . . treatment efforts would not be productive or successful." The court found and concluded that "there is no less restrictive alternative to treatment within a . . . residential mental health facility." The court then issued an order of hospitalization for a period of ninety days, which defendant now appeals.

¶ 11. Defendant makes two arguments on appeal: (1) the evidence does not support the court's hospitalization order; and (2) her statements to Dr. Cotton during her examination could not be used to support a hospitalization order. We reject both arguments and affirm the hospitalization order.

¶ 12. First, the evidence amply supported the court's findings. By statute, the State had to prove its case by clear and convincing evidence. 18 V.S.A. § 7616(b). We have explained that the clear-and-convincing-evidence standard is "generally said to require proof that the existence of the contested fact is highly probable rather than merely more probable than not." *In re N.H.*, 168 Vt. 508, 512, 724 A.2d 467, 470 (1998) (quotations omitted). The standard "does not mean, however, that the State's evidence must be wholly uncontradicted or unim-

peached." *Id.* Thus, "[t]he test on review is not whether this Court is persuaded that there was clear and convincing evidence, but whether the factfinder could reasonably have concluded that the required factual predicate was highly probable." *Id.* at 512-13, 724 A.2d at 470. In making that determination, we take the evidence in the light most favorable to the State. *Id.* at 513, 724 A.2d at 470.

¶ 13. Here, the court reasonably concluded that defendant posed a danger of harm to others because of her mental illness. The testimony of the two arresting officers showed that defendant struggled violently during her two arrests. The report and testimony of Dr. Cotton established that this violent behavior resulted from her mental illness. His testimony also supported the court's finding that defendant would not voluntarily accept treatment for her mental illness. In synthesizing these valid findings, the court properly concluded that hospitalization was required because, outside of a hospital setting, defendant posed a danger to others and would not be able to remedy the situation by acknowledging, let alone treating, her mental illness.

¶ 14. Contrary to defendant's claim in her brief, the testimony and conclusions of Dr. Cotton were not conclusory or speculative. They were based on his observations of and interactions with defendant during the examination, filtered through his years of experience. Further, we agree with the State that the court considered the possibility of less-restrictive alternatives and properly rejected them, based on the evidence of the extent of defendant's mental illness and the fact that it made her a danger to others. In sum, we hold that the hospitalization order was properly supported by the evidence.

¶ 15. Next, we reject defendant's argument that her statements during her examination were improperly used against her to support the hospitalization order. Defendant contends that her Fifth Amendment privilege against self-incrimination was violated when the results of the examination were used to support the hospitalization order. She cites *Estelle v. Smith* for the proposition that a "criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statement can be used against him at a capital sentencing proceeding." 451 U.S. 454, 468 (1981). She then argues that her Fifth Amendment rights were violated because "[t]here is no practical distinction" between being involuntarily hospitalized and being incarcerated. We disagree.

¶ 16. While defendant is correct that the privilege is theoretically available in the context of any pretrial psychiatric examination, *State v. Bushey*, 147 Vt. 140, 144, 513 A.2d 1177, 1180 (1986), its applicability in a given case depends on the "nature of the statement or admission and the exposure which it invites." *Estelle*, 451 U.S. at 462 (quotations omitted). Focusing on the nature of the exposure invited by a psychiatric examination, Justice Souter, as a member of the New Hampshire Supreme Court, noted that "*Estelle* did not hold that the fifth amendment would be implicated by an order directed to elicit testimonial evidence bearing on purely protective, nonpunitive commitment." *State v. Mercier*, 509 A.2d 1246, 1250 (N.H. 1986). The *Mercier* court rejected the defendant's argument — namely, that his constitutional rights were violated by a psychiatric examination that resulted in his hospitalization after a jury found him not guilty by reason of insanity — because it viewed the hospitalization proceeding as a "non-incriminating use of testimonial evidence derived from the examination." *Id.*

¶ 17. In this case, once the court found defendant to be incompetent, she was no longer at risk of conviction and punishment. See *Heller v. Doe*, 509 U.S. 312, 325 (1993) (observing that "confinement in prison is punitive and hence more onerous than confinement in a mental hospital"). Thus, as in *Mercier*, the hospitalization portion of the proceeding entailed a nonincriminating use of the evidence derived from Dr. Cotton's examination and did not implicate defendant's privilege against self-incrimination.

¶ 18. Further, we note that if statements made in a psychiatric examination surface in a later proceeding in a manner that would expose the speaker to conviction or punishment, the speaker could at that point invoke the privilege and have the statements excluded. *Mercier*, 509 A.2d at 1250. Here, defendant can point to no such statements, because the court's competency decision removed the possibility of conviction or punishment. In sum, we perceive no error in the court's use of the examination in support of its hospitalization order.

¶ 19. Finally, defendant suggests that she lacked notice that the court would address the question of hospitalization at the October 18 hearing. We note, however, that the three examination orders all state that if defendant were found incompetent a hospitalization hearing would follow immediately. Moreover, when the court stated that it would hear argument on both competency and hospitalization, the defense did not object. Thus, reversal is not warranted based on a purported lack of notice to defendant.

*Affirmed.*