VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      24-AP-091

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SEPTEMBER TERM,   2024

In re S.P., Juvenile
(K.B., Mother\*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Chittenden Unit,
Family Division
CASE NO. 21-JV-01392
Trial Judge: Megan J. Shafritz

In the above-entitled cause, the Clerk will enter:

Mother appeals termination of her parental rights to S.P., born in September 2021.[1]  On appeal, mother argues that the family division erred in finding that mother's progress had stagnated and that key findings were not properly supported by the evidence.  Mother also contends that the Department for Children and Families (DCF) did not make reasonable efforts to reunify S.P. with mother and violated mother's due process rights.  We affirm.

The family division found the following facts by clear and convincing evidence.  Shortly after S.P.'s birth, the State filed a petition alleging that S.P. was a child in need of care or supervision (CHINS) due to parent's chronic homelessness and mother's substance abuse and mental-health issues.  In January 2022, mother stipulated that S.P. was CHINS for risk of harm because at the time of S.P.'s birth mother tested positive for cocaine and illicit substances and had not yet begun treatment.  At disposition, the court approved a plan with a  goal of reunification within six months.  The plan's goals for mother included maintaining sobriety and safe and stable housing, attending counseling for substance-use and mental-health issues, participating in parent education, providing drug-screening tests, attending court hearings, and remaining engaged with DCF.  Mother entered a residential program with S.P. in February 2022 and graduated in August 2022.  After her discharge, mother was unable to secure housing and S.P. was placed in a foster home.  Mother relapsed and used illicit substances for the following year.  In January 2023, the court amended the disposition order to extend the reunification period and provide parents with additional time to make progress.

Parents did not make lasting progress on the case-plan goals and in May 2023, the State filed a petition to terminate parental rights.  In November 2023, mother was incarcerated in

---

[1]  The court also terminated father's parental rights.  Father did not appeal that decision and this decision therefore focuses on the facts related to mother.

Vermont and released in February 2024. Mother maintained sobriety after her incarceration but continued to lack permanent housing. Mother's last in-person visit with S.P. was in February 2023 and last visit by video was in December 2023 while incarcerated.

In June 2023, S.P. was placed with her paternal grandmother in Maryland. Mother learned about the placement in September 2023 and was upset about the decision. S.P. adjusted well to grandmother's home and community. She began meeting her developmental milestones and made friends. Grandmother is willing to be a permanency option for S.P. and to adopt her.

Following a hearing, the court made written findings on the State's petition. The court found that there was a change of circumstances due to mother's lack of progress in addressing the reasons S.P. was taken into custody. Mother did not maintain stable housing, address her substance abuse and mental health, have consistent visits with S.P., or stay engaged with DCF. As to S.P.'s best interests, mother did not play a constructive role in S.P.'s life, and would not be able to resume parenting within a reasonable time given S.P.'s young age and need for stability. S.P. was bonded with her paternal grandmother and connected to her current home, school, and community. Therefore, the court concluded that termination was in S.P.'s best interests and granted the petition. Mother appeals.

When the State moves to terminate parental rights after the initial disposition, the court must first find that there is a change of circumstances, 33 V.S.A. § 5113(b), and second, "that termination of parental rights is in the child's best interests." In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem.). In assessing the child's best interests, the court must consider the statutory criteria. 33 V.S.A. § 5114(a). The most important factor is whether the parent will be able to resume parenting duties within a reasonable time. In re J.B., 167 Vt. 637, 639, (1998) (mem.). On appeal, we will uphold the family court's conclusions if supported by the findings and affirm the findings unless clearly erroneous. Id.

On appeal, mother first argues that the family division erred in finding that there was a change of circumstances due to stagnation. The family division "must find stagnation, as well as best interests, by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108. Analogizing to civil-commitment cases that also employ a clear-and-convincing-evidence standard, mother contends that the evidentiary standard required "substantial evidence" and several key findings supporting the court's decision are not supported by such evidence. See In re N.H., 168 Vt. 508, 512 (1998) (explaining that clear and convincing means "something less than proof beyond a reasonable doubt," but "substantially more rigorous than the mere preponderance standard usually applied in the civil context, and is generally said to require proof that the existence of the contested fact is 'highly probable' rather than merely more probable than not"). Even if we were to accept the standard articulated by mother, as set forth below, the facts here are sufficient to support the court's findings regarding mother's stagnation. In re N.H. emphasized that clear and convincing does not mean "wholly uncontradicted or unimpeached," and this Court will not "reweigh the evidence, and make its own independent findings and conclusions." Id. This standard has been articulated many times related to termination decisions. We will affirm the court's findings unless they are clearly erroneous and when findings are challenged, "our role is limited to determining whether they are supported by credible evidence." In re A.F., 160 Vt. 175, 177 (1993). "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." Id.

Mother asserts that the evidence does not support the findings that she failed to take steps to address her lack of housing and substance abuse, did not maintain regular contact with DCF, and did not have consistent visits with S.P. The court found as follows:

> Even accepting the housing crunch, mother did not take the steps necessary to maintain stable housing on her own or engage in the case plan action steps designed to help accomplish this, such as addressing her substance abuse and mental health issues through treatment and counseling and remaining in close contact with DCF.

The following evidence was presented at the termination hearing in February 2024. Mother was aware that she needed to secure housing prior to her release from Lund, but did not submit her applications until right before her discharge date. When she left Lund in August 2022, mother did not have permanent housing; she had a housing voucher but she was unable to locate a motel with vacancy that would accept it. Mother's DCF caseworkers attempted to help mother find emergency housing upon her release, but they were unsuccessful, and S.P. was placed in respite care apart from mother. Within a few months of leaving Lund, mother relapsed and continue to use substances until she was incarcerated in November 2023. Mother did not engage in the DCF case plan after her relapse. In September 2023, mother was assigned a new caseworker and when mother was informed of the change in caseworkers, she threatened the former caseworker and DCF. Mother did not maintain contact with DCF. Mother last saw S.P. in person in January 2023. The new caseworker testified that she attempted to contact mother, but the telephone number was out of service and then mother was incarcerated. Mother was in community treatment at the time of the termination hearing, but continued to lack permanent housing. This evidence supports the court's findings, quoted above, that mother did not take the necessary steps to maintain stable housing, address her substance abuse and mental health, and remain in close contact with DCF.

The record is also sufficient to support the court's determination that mother's progress stagnated due to factors within her control; mother did not take steps necessary to maintain housing and engage with the case plan to address her substance-abuse and mental-health issues or maintain contact with DCF. Mother emphasizes her difficulties in finding housing, especially after her release from Lund, and how her economic situation and lack of housing contributed to her relapse. Mother's transition from Lund was one small part of the case history. S.P. was taken into custody at birth and during the two and a half years preceding the termination hearing, for long periods of time mother was not engaged with DCF. After mother left Lund, she relapsed, and was incarcerated on two occasions. Mother was provided time to achieve reunification—this period was even extended by the family division—but did not take steps to engage with DCF or address her addiction, mental-health, or housing issues. Although mother had made recent progress at the time of the final hearing, she agreed that she was not able to care for S.P. To the extent that mother claims DCF provided her with insufficient assistance, mother did not seek such assistance below and on appeal she has not identified what additional steps DCF should have taken. While mother may view the evidence in a different manner, there was sufficient evidence to support the court's assessment of the evidence, demonstrating that mother's lack of progress was due to factors within her control.

Mother also raises arguments concerning DCF's placement of S.P. with her paternal grandmother. She claims that the evidence also does not support the court's finding that S.P. was well-adjusted to her placement with her paternal grandmother because these findings were based

3

on testimony from grandmother and the DCF caseworker.[2]  It was up to the trial court to determine the weight and credibility to give to the evidence and the court did not err in relying on the testimony of grandmother and the DCF caseworker to find that S.P. was bonded to grandmother and well-adjusted to grandmother's home and community.

Mother also claims that DCF deprived her of due process by moving S.P. to Maryland without notice.  Mother testified that she did not know S.P. had been placed in Maryland with grandmother until months after the move happened.  In July 2023, when DCF placed S.P. with maternal grandmother, DCF had legal custody of S.P. pursuant to the existing disposition order.  DCF therefore had authority over decisions regarding S.P.'s placement.  33 V.S.A. § 5106(4).  Mother has not provided a legal basis for her to challenge DCF's placement decision in the context of this appeal.  The sole question for the family division at termination was whether termination of mother's rights was in S.P.'s best interests.  S.P.'s relationship to her grandmother and adjustment to her current home and community were certainly relevant to the court's best-interests analysis, 33 V.S.A. § 5114(a)(1), (2), but the placement itself was not a matter before the court at termination.

In any event, the evidence demonstrates that mother's own lack of engagement in the proceedings was the cause of her lack of information regarding S.P.'s placement.  After leaving Lund in August 2022, S.P. was placed with a respite provider in a nonadoptive home.  Mother had inconsistent and then no contact with S.P. during this time and last saw S.P. in January 2023.  S.P. was placed with grandmother in June 2023.  Mother failed to maintain contact with DCF during much of 2023, even after she learned that S.P. was placed with maternal grandmother.  Mother did not attend court proceedings from July 2022 to the termination hearing in February 2024.  In an October 2022 order, the family division noted that since mother left Lund, she had disengaged from DCF and with treatment providers and therefore DCF was considering a home study of grandmother for a permanent placement.  An amended disposition plan was issued in January 2023, which also indicated that DCF had requested a home study of S.P.'s paternal grandmother "as a potential placement option if reunification is not an option."  The placement was discussed in other hearings and orders.  Therefore, mother had a full opportunity to learn about S.P.'s placement and her lack of information was due to her own disengagement with DCF and the judicial process.

Mother also argues that DCF did not make reasonable efforts to reunify S.P. with her because DCF placed S.P. in Maryland, making contact difficult for mother.  The reasonable-efforts determination is separate from the issues presented at termination.  In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29 (explaining that "extent of DCF's efforts to achieve the permanency plan is not one of the best-interests factors to be considered at termination").  Mother did not appeal the reasonable-efforts determination and it is therefore outside the scope of this appeal from the court's decision to terminate mother's parental rights.  See In re M.P., 2019 VT 69, ¶ 41, 211 Vt.

---

[2]  Mother asserts that the State produced no evidence showing that it was in S.P.'s best interests to be adopted by grandmother.  This was not a finding required at termination.  The best-interests factors do not require the family division to make findings regarding the particular permanency plan contemplated for the child, or the likelihood of adoption.  See In re S.B., 174 Vt. 427, 430 (2002) (mem.) ("[W]e have repeatedly stated 'that a valid termination of parental rights does not depend on the availability of permanent foster care or adoption.' " (quoting In re D.M., 162 Vt. 33, 40 (1994)).

20 (denying father's challenge to trial court's reasonable-efforts finding because father did not object when given chance by court below)

Mother raises additional arguments regarding the court's findings underpinning its best-interests analysis, particularly that she would not be able to resume parenting within a reasonable time. Mother contends that at the time of the final hearing mother was prepared to return to Lund with S.P. and therefore she was able to resume parenting within a reasonable time. In assessing the child's best interests, the most important factor is a parent's ability to resume parenting within a reasonable period of time, which "is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325 (quotation omitted). At the time of the final hearing, S.P. was approximately two-and-a-half years old and had been in custody her entire life. Although mother had made recent progress towards sobriety, mother continued to lack housing and agreed that she was not able to care for S.P. for at least six months. Given S.P.'s young age, time in custody, and need for permanency, the court reasonably concluded that mother would not be able to parent within a reasonable time.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Nancy J. Waples, Associate Justice